## HARTER *v.* TWOHIG.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF NEBRASKA.

No. 251. ' Argued and submitted April 4, 1895. — Decided May 27, 1895.

In 1858 H. loaned to W. a sum of money, receiving from him his note pay-
able in one year with interest. No part of the sum on the note was ever
paid, either to H. in his lifetime or to his representatives. Simultane-
ously with the loan H. conveyed to K. as trustee a tract of land in
Nebraska to secure the payment of the note. The remaining interest of
W. in the tract subsequently came to T. through sundry mesne convey-
ances. · H. paid the taxes on the property from March, 1862, until his
death in 1876. Shortly before his death he gave directions to have
the trust deed foreclosed, and proceedings were taken to that end, a
judgment was obtained, the property was sold to H., and a deed made to
him accordingly. H. verified the petition which was the foundation of
these proceedings, but the day before it was filed he died. The deed to
him after the sale was delivered to his children, who in good .faith filed
the same for record and continued to pay taxes on the property, claim-
ing to be owners. During all that time and down to 1888 neither W. nor
any one claiming under him except H. and his representatives, ever exer-
cised any right of ownership of the land. Then T. commenced proceed-
ings in a state court of Nebraska, which were removed into the Federal
court, to have the tax sale deed set aside and declared void, and to
redeem from that sale, and such proceedings were had that a decree was
entered allowing redemption. *Held*, that the doctrine of laches was
applicable; that the claim was stale; and that no court of equity would
be justified in permitting the assertion of an outstanding equity of
redemption, after such a lapse of time, and in the entire absence of the
elements of good faith and reasonable diligence.

FEBRUARY 27, 1858, Eugene L. Wilbur entered the west half
of the northeast quarter of section 33, township 29, range 9
east, situated in Dakota County in the then Territory of Ne-
braska, paying therefor the sum of $1.25 per acre. On the
same day Wilbur executed and delivered a trust deed to Au-
gustus Kountze, as trustee, conveying said land to secure to
Isaac Harter, the father of appellants, the payment of a prom-
issory note for one hundred and forty dollars, bearing that date
and due one year thereafter, with interest at the rate of four

per cent per month after maturity. No part of the interest or principal due upon this note was ever paid to Isaac Harter or to appellants. On March 2, 1860, Wilbur and wife by a quit-claim deed conveyed the eighty acres to William F. Lockwood, and on February 6, 1861, Lockwood and his wife, Mary A., by warranty deed, conveyed the same to James W. Virtue for a consideration of forty dollars in money and twenty-five dollars in property, who, on February 3, 1863, by warranty deed conveyed an undivided one-half interest to Mary A. Lockwood. Virtue was the witness to the trust deed to Kountze, and it was acknowledged before him as notary public. The record further shows that Isaac Harter, now deceased, paid the taxes on the property from 1862 to the time of his death, which occurred February 27, 1876; that Isaac Harter had placed the trust deed and the notes secured thereby in the hands of his attorney to foreclose the same, and that a petition for such foreclosure had been verified February 21, 1876, and was filed February 28, 1876, in the District Court of Dakota County, Nebraska; that the defendants in the suit were William F. Lockwood, Mary A. Lockwood, his wife, and Augustus Kountze, the trustee; that they were brought in by publication, and constructive service on them having been thus duly obtained, a decree foreclosing the trust deed was entered June 5, 1876, at the June term, 1876, of the court, in favor of Isaac Harter and against William F. Lockwood, Mary A. Lockwood, and Augustus Kountze, and such proceedings were thereupon had that the property in controversy was sold by the sheriff under the decree to Isaac Harter, August 12, 1876. It further appeared that the amount due on the promissory note June 5, 1876, was $1248, and that the property was appraised at $880 before the sheriff's sale. May 10, 1877, the sale having theretofore been approved by the court, a deed to Isaac Harter was duly executed by the sheriff of Dakota County, Nebraska, for the eighty acres in question, and by him delivered to the attorney of Isaac Harter, who delivered the same to appellants, and they, not realizing that there was any irregularity connected with the proceedings, and believing they had a good and sufficient title to the property, filed the same on

June 10, 1877, for record with the county clerk of Dakota County, and thereafter, and until the commencement of this cause, held themselves to be the owners thereof; paid the taxes thereon; offered the same for sale; had correspondence with divers parties concerning the land, and exercised all the rights of property and dominion over the same which was exercised by any person from June 1, 1877, to December 21, 1888, when this action was commenced, the acts of ownership being such that the tract was generally known in the community where it was located as "the Harter land." The land remained of comparatively little value up to the spring of 1887, when a railroad bridge was built across the Missouri River to Sioux City and to South Sioux City, where a town was laid out, and it then rose rapidly in value until, at the time of the commencement of this action, it was worth $100 to $150, and, pending this suit, $200, per acre.

In the summer of 1888, James P. Twohig was the clerk of the District Court of Dakota County, Nebraska, when an affidavit was filed therein by Isaac Harter, one of the appellants, for the purpose of perfecting the title to another piece of real estate in that county, belonging to appellants, and which they were about to sell, which affidavit showed that Isaac Harter, the father of affiant, died February 27, 1876. Thereafter James P. Twohig obtained a quit-claim deed from James W. Virtue of the eighty acres for a consideration of $350, bearing date September 3, 1888, and filed for record September 22, 1888. Twohig then wrote appellant Isaac Harter a letter stating that he had title to the land and demanding a settlement, which was the first information that appellants had of any claim whatever against their title. On December 21, 1888, Twohig filed his petition against appellants in the District Court of Dakota County, Nebraska, which was subsequently duly removed into the Circuit Court of the United States for the District of Nebraska, praying judgment that the decree in favor of Isaac Harter, deceased, of June 5, 1876, and the sheriff's deed based thereon, might be set aside and declared void, and Twohig be allowed to redeem the undivided half of the real estate from the lien of the trust deed to

Kountze on paying to defendants the amount legally and equitably due them. While the suit was pending and on or about January 28, 1889, Twohig obtained a quit-claim deed from Mary A. Lockwood and William F. Lockwood for an undivided one-half of the land for a consideration of $50, and on November 20, 1890, filed his supplemental petition in the Circuit Court praying the same relief as to the whole of the land.

It appeared that in 1866, William F. Lockwood and his wife, Mary A., left Dakota County, Nebraska, and never returned to that State, and that two years before, James W. Virtue left that county and went to Washington Territory, where he has since resided. Neither Virtue nor Mr. or Mrs. Lockwood, from 1864, ever exercised any rights of ownership whatever over the land in controversy, which land had never been cultivated or fenced, and up to the year 1887 was wild land.

Appellants answered and set up the defences of the statute of limitations; of abandonment; of title by adverse possession; and of laches. On a reference certain findings of fact were made, which have been substantially anticipated in the foregoing statement. Thereupon it was held by the Circuit Court that the decree which ordered a sale of the premises in the suit of Isaac Harter, Sr., was absolutely void; that neither complainant nor defendants were ever in the actual possession of the land, and the statute of limitations did not apply; that Virtue was not a party defendant to the foreclosure case, and in any event his grantee ought to be permitted to redeem; that defendants were entitled to the return of taxes paid with interest, and payment of the indebtedness secured by the trust deed to Kountze with interest; and a final decree was entered allowing redemption on payment of the amount found, from which decree both parties appealed to this court.

*Mr. Henry W. Harter*, with whom was *Mr. J. H. Swan* on the brief, for appellants.

*Mr. W. E. Gantt* for appellee submitted on his brief.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

In respect of the nature of a conveyance in mortgage at common law, the legal title vested in the mortgagee and was forfeited upon default, but equity established the right of redemption after default. And, variously modified, where the common law doctrine prevails, a mortgage is still regarded as a conveyance in fee, although a conveyance as a security, while in many of the States this has been changed, chiefly by statute, so that a mortgage is regarded merely as a pledge. The common law, so far as applicable, and not inconsistent with the Constitution of the United States or the organic law of the Territory, or with any law of the territorial legislature, was adopted and declared to be law within the Territory of Nebraska by act of March 16, 1855, Laws Nebraska, 1855, 328, but by section 30 of an act approved February 21, 1855, (Ib. p. 166,) it was provided that "in the absence of stipulations to the contrary, the mortgagor of real estate retains the legal title and right of possession thereof." Thus, irrespective of the terms of the instrument in particular cases, instead of the mortgagee being entitled to immediate possession of the mortgaged property as an incident of the title, the mortgagor was entitled to possession until foreclosure. The conveyance in this case was, however, a trust deed and not a mortgage, and by section 676 of the law of the Territory, also approved March 16, 1855, Laws Nebraska, 55, 119, it was provided: "Deeds of trust of real or personal property may be executed as securities for the performance of contracts, and sales made in accordance with their terms are valid. Or they may be treated like mortgages, and foreclosed by action in the district court." This recognized the distinction between a trust deed and a mortgage, and while providing that a trust deed might be treated like a mortgage and foreclosed as mortgages might be, did not undertake to deal with the legal title which passed by the conveyance to the trustee. The section was in terms adopted from the Code of Iowa of 1851, (Code Iowa, 1851, c. 118, § 2096; Laws Nebraska, 1855, p. 55,) which Code likewise contained the provision as to the retention of the legal title by the mortgagor above quoted from the law of Nebraska of February 21, 1855 (Code Iowa, 1851, § 1210).

And it has been repeatedly held by the Supreme Court of Iowa that the legal title vests in the trustee under such a deed. *Devin* v. *Hendershott*, 32 Iowa, 192, 194; *Newman* v. *De Lorimer*, 19 Iowa, 244; *Tucker* v. *Silver*, 9 Iowa, 261; *Cook* v. *Dillon*, 9 Iowa, 407.

It is true that in *Webb* v. *Hoselton*, 4 Nebraska, 308, decided at January term, 1876, the Supreme Court of Nebraska held that a conveyance in the form of a deed of trust to secure the payment of a promissory note conditioned, that in case of failure to pay, the trustee shall sell, or, upon payment, reconvey, is in effect only a mortgage. Of course, in many particulars, the attributes of deeds of trust and mortgages with a power of sale are the same. Both are intended as securities; in both, if not controlled by statute, the legal title passes from the grantor, but in equity he is, before foreclosure, considered the actual owner; and in both the grantor has the right to redeem. But that case did not involve the application of the territorial act to which we have referred, and changes had taken place in legislation during the intervening period.

The land in question was unoccupied and wild land, and there being no adverse holding, upon breach of condition, if not before, the legal title which Kountze held drew to it the possession, although in subjection to the right of redemption in Wilbur and his grantees, so that, when this bill was filed to redeem from the trust deed, the question at once arose whether there was then an equity of redemption outstanding which complainant could assert and which a court of equity would recognize.

Although actual possession by a mortgagee, under a claim of ownership, continued for the time required by statute might be requisite to convert a mortgage title into a title absolute, yet, notwithstanding that, in a case such as this, whether or not redemption will be accorded, depends upon the equities between the parties.

Twenty-nine years had elasped after the breach of condition before this bill was filed, but in the meantime the proceedings for foreclosure complained of had been had. This was in 1876, the sheriff's deed being given in 1877, eleven years before

complainant's bill was filed. It is settled law in Nebraska that a judgment rendered against a person or in his favor is reversible after his death if the fact and time of death appear upon the record, or in error *coram nobis*, if the facts must be shown *aliunde;* the judgment is voidable and not void, and cannot be impeached collaterally. *Jennings* v. *Simpson,* 12 Nebraska, 558; *McCormick* v. *Paddock,* 20 Nebraska, 486. Here, however, the petition to foreclose was filed after the death of Isaac Harter, and without pausing to examine the other irregularities relied on, it is sufficient to say that we think the foreclosure decree was void. But if the initiation of those proceedings operated to acknowledge an outstanding right of redemption at that time, their culmination and the deed of the sheriff must be recognized as evidence of the assertion of an extinguishment of such equity.

By section 6 of chapter 57 of the General Statutes of Nebraska of 1873, (Gen. Stat. 525,) it was provided that, "An action for the recovery of the title or possession of lands, tenements, or hereditaments, can only be brought within ten years after the cause of such action shall have accrued. This section shall be construed to apply also to mortgages."

In *McKesson* v. *Hawley,* 22 Nebraska, 692, a sale had taken place under a trust deed, and grantees under the purchaser at the trustee's sale, one Hartley, had taken and held adverse possession of the land for more than ten years prior to the commencement of the action, which was brought to redeem from the trust deed on the ground that the proceedings to sale under it were invalid. The Supreme Court of Nebraska held that the provisions of the above section applied; that an action to redeem from a mortgage was barred in the same time an action to foreclose would be, and could not be maintained after ten years from the date when the right of action accrued, which was in that case as soon as adverse possession was taken under the alleged purchase from the trustee; and the court said: " But it is contended by plaintiff that the possession of defendant and her grantors was not adverse; that the title of the trustee was a recognition of the plaintiff's title, and that, as the foreclosure proceedings were void, defendants could hold

only as assignees of the rights of the trustees, and, therefore, not adverse. Such, to our mind, cannot be the law. Notwithstanding the fact that the foreclosure proceedings might have been void, it is clear that the purpose of such proceedings was to cut off and destroy the title of plaintiff; and therefore the conveyance by the trustee to Hartley, had it been legal, would have terminated plaintiff's title. The grantees of Hartley taking and holding the property, or asserting their right to hold it under warranty deeds from him, was clearly adverse to plaintiff. They held as owners and the statute would run in their favor."

Even if in the case in hand the possession may be regarded as constructive merely, yet as the legal title was in the trustee and not in Wilbur, and only a bare right to redeem could be transferred to and by Wilbur's grantees, we hold that the same principle by analogy applied to them and to Twohig, which could only be overcome, if at all, by superior equities on his part. And we do not perceive that any such equities existed.

It appears from the record that from 1867 to 1877, inclusive, the land was assessed and taxed in the name of Isaac Harter; from 1878 to 1885, inclusive, in the name of Isaac Harter, Jr., one of the heirs of Isaac Harter; and from 1886 to 1889, inclusive, in the name of H. W. Harter, another of said heirs; that after the maturity of the trust deed, Isaac Harter paid the annual taxes from and including those of 1861 to the day of his death, and that his heirs, the appellants, paid the annual taxes from that time down to and including those for 1888; that the land was treated during all this time as belonging to Harter and his heirs, and notoriously known as the "Harter land." It further appears that both Lockwood and Virtue knew of the outstanding trust deed, which was indeed acknowledged before Virtue, and the claim of Harter thereunder, and that Lockwood and his wife knew of the pendency of the foreclosure suit; that Mr. and Mrs. Lockwood left the county and State in 1866 and Virtue in 1864, and never returned, except that Virtue paid a temporary visit there in the summer of 1888, when he conveyed to Twohig, and that the Lockwoods and Virtue paid no atten-

tion whatever to the land nor asserted any ownership therein after their departure. The record discloses another fact, that when Virtue left Dakota City he placed his business affairs in the hands of an agent, who attended thereto, and that taxes were paid on certain lands in Dakota City as late as 1877 on behalf of Virtue, while no attention was given to the land in controversy. In the summer of 1888 the affidavit of Isaac Harter, Jr., was filed in the county court, in the course of disposing of other real estate than this, to the effect that Isaac Harter, upon his decease, had left no debts unpaid, and therefrom it also appeared that Isaac Harter died February 27, 1876, whereupon the clerk who had filed the affidavit obtained a quitclaim from Virtue and set up this claim to the land. The land, which was worth perhaps a hundred and twenty dollars in 1858, had suddenly increased in value to about twelve thousand dollars in 1888, chiefly within the year or two preceding.

Under these circumstances we think the doctrine of laches was applicable; that the claim was stale; and that no court of equity would be justified in permitting the assertion of an outstanding equity of redemption after such a lapse of time and in the entire absence of the elements of good faith and reasonable diligence.

*Decree reversed and cause remanded with directions to dismiss the bill.*