19-2719-cv
*Fund Liquidation Holdings LLC v. Bank of America Corp.*

# United States Court of Appeals
# For the Second Circuit

August Term 2020

Argued:  September 11, 2020
Decided:  March 17, 2021

No. 19-2719-cv

FUND LIQUIDATION HOLDINGS LLC, AS
ASSIGNEE AND SUCCESSOR-IN-INTEREST TO
FRONTPOINT ASIAN EVENT DRIVEN FUND,
L.P., ON BEHALF OF ITSELF AND ALL OTHERS
SIMILARLY SITUATED, SONTERRA CAPITAL
MASTER FUND, LTD.,

*Plaintiffs-Appellants*,

FRONTPOINT ASIAN EVENT DRIVEN FUND,
LTD., FRONTPOINT ASIAN EVENT DRIVEN
FUND, L.P.,

*Plaintiffs*,

*v.*

BANK OF AMERICA CORPORATION, BANK OF
AMERICA, N.A, ROYAL BANK OF SCOTLAND
PLC, THE ROYAL BANK OF SCOTLAND GROUP
PLC, RBS SECURITIES JAPAN LIMITED, UBS
AG, UBS SECURITIES JAPAN CO., LTD., ING
GROEP N.V., ING BANK N.V., BNP PARIBAS,

S.A., BNP PARIBAS NORTH AMERICA, INC.,
BNP PARIBAS SECURITIES CORP., BNP
PARIBAS PRIME BROKERAGE, INC., OVERSEA-
CHINESE BANKING CORPORATION LTD.,
BARCLAYS PLC, BARCLAYS BANK PLC,
BARCLAYS CAPITAL INC., DEUTSCHE BANK
AG, CREDIT AGRICOLE CORPORATE AND
INVESTMENT BANK, CREDIT AGRICOLE S.A.,
CREDIT SUISSE GROUP AG, CREDIT SUISSE
AG, STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC, DBS BANK
LTD., DBS GROUP HOLDINGS LTD., DBS
VICKERS SECURITIES (USA) INC., UNITED
OVERSEAS BANK LIMITED, AUSTRALIA AND
NEW ZEALAND BANKING GROUP, LTD.,
BANK OF TOKYO-MITSUBISHI UFJ, LTD., THE
HONGKONG AND SHANGHAI BANKING
CORPORATION LIMITED, HSBC BANK USA,
N.A., HSBC HOLDINGS PLC, HSBC NORTH
AMERICA HOLDINGS INC., HSBC USA INC.,
MACQUARIE BANK LTD., MACQUARIE GROUP
LTD., COMMERZBANK AG, ING CAPITAL
MARKETS LLC, CREDIT SUISSE
INTERNATIONAL, ANZ SECURITIES, INC.,
UOB GLOBAL CAPITAL, LLC,

*Defendants-Appellees*,

CITIBANK, N.A., CITIGROUP INC., JPMORGAN
CHASE & CO., JP MORGAN CHASE BANK,
N.A., JOHN DOES, NOS. 1–50,

*Defendants*.[*]

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

---

Appeal from the United States District Court
for the Southern District of New York
No. 16-cv-5263, Alvin K. Hellerstein, *Judge*.

---

Before:     SULLIVAN, PARK, and NARDINI, *Circuit Judges*.

In 2016, two Cayman Islands investment funds filed a class action complaint against numerous banks, alleging that the banks had conspired to manipulate certain benchmark interest rates. It was not until a year later that the banks discovered that the two plaintiff funds had been dissolved years earlier, and that the case was actually being prosecuted by a separate entity, Fund Liquidation Holdings LLC, which maintains that it was assigned the dissolved entities' claims. The district court (Hellerstein, *J.*) dismissed the case with prejudice for lack of subject-matter jurisdiction, reasoning that, because the action was initiated by non-existent parties, the case was a legal nullity and so could not be salvaged through Federal Rule of Civil Procedure 17.

On appeal, we are primarily tasked with deciding two issues: (i) whether the dissolved entities possessed Article III standing when the case was initiated, and, if not, (ii) whether Fund Liquidation is nevertheless able to join the action through Rule 17. We conclude that the dissolved funds lacked standing, but that Article III was nonetheless satisfied because Fund Liquidation, the real party in interest, has had standing at all relevant times and may step into the dissolved entities' shoes. As a result, we **VACATE** the district court's judgment, and **REMAND** the case for additional proceedings.

VACATED AND REMANDED.

ERIC F. CITRON (Vincent Briganti, Margaret MacLean, Lowey Dannenberg, P.C., White Plains, NY, *on the brief*), Goldstein & Russell, P.C., Bethesda, MD, *for Plaintiffs-Appellants Fund Liquidation Holdings LLC and Sonterra Capital Master Fund, Ltd.*

JOEL KURTZBERG (Herbert S. Washer, Elai Katz, Jason M. Hall, Lauren Perlgut, Adam S. Mintz, *on the brief*), Cahill Gordon & Reindel LLP, New York, NY, *for Defendants-Appellees Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse International.*

Arthur J. Burke, Paul S. Mishkin, Adam G. Mehes, Davis Polk & Wardwell LLP, New York, NY, *for Defendants-Appellees Bank of America Corporation and Bank of America, N.A.*

Penny Shane, Corey Omer, Sullivan & Cromwell LLP, New York, NY, *for Defendants-Appellees Australia and New Zealand Banking Group Limited and ANZ Securities, Inc.*

Christopher M. Viapiano, Elizabeth A. Cassady, Sullivan & Cromwell LLP, Washington, DC, *for Defendant-Appellee The Bank of Tokyo-Mitsubishi UFJ, Ltd., n/k/a MUFG Bank, Ltd.*

Jonathan D. Schiller, Christopher Emmanuel Duffy, Leigh M. Nathanson, Boies Schiller Flexner LLP, New York, NY, *for Defendants-Appellees Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*

Jayant W. Tambe, Stephen J. Obie, Kelly A. Carrero, Jones Day, New York, NY, *for Defendants-Appellees BNP Paribas, S.A., BNP Paribas North America, Inc., BNP Paribas Securities Corp., and BNP Paribas Prime Brokerage, Inc.*

David R. Gelfand, Mark D. Villaverde, Milbank LLP, New York, NY, *for Defendant-Appellee Commerzbank AG.*

Andrew Hammon, Kimberly Anne Havlin, White & Case LLP, New York, NY; Darryl S. Lew, White & Case LLP, Washington, DC, *for Defendants-Appellees Crédit Agricole Corporate and Investment Bank and Crédit Agricole S.A.*

Erica S. Weisgerber, Debevoise & Plimpton LLP, New York, NY, *for Defendants-Appellees DBS Bank Ltd., DBS Group Holdings Ltd., and DBS Vickers Securities (USA) Inc.*

Aidan Synnott, Hallie S. Goldblatt, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for Defendant-Appellee Deutsche Bank AG.*

Christopher M. Paparella, Steptoe & Johnson LLP, New York, NY, *for Defendants-Appellees Macquarie Bank Ltd. and Macquarie Group Ltd.*

C. Fairley Spillman, Pratik A. Shah, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, *for Defendant-Appellee Oversea-Chinese Banking Corporation Limited.*

David S. Lesser, Jamie S. Dycus, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for Defendants-Appellees The Royal Bank of Scotland plc, The Royal Bank of Scotland Group plc, and RBS Securities Japan Limited.*

Marc J. Gottridge, Lisa J. Fried, Benjamin A. Fleming, Hogan Lovells US LLP, New York, NY, *for Defendants-Appellees Standard Chartered Bank and Standard Chartered plc.*

5

Dale C. Christensen, Jr., Noah Czarny, Seward & Kissel LLP, New York, NY, *for Defendants-Appellees United Overseas Bank Limited and UOB Global Capital, LLC.*

Nowell D. Bamberger, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC; Charity E. Lee, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendants-Appellees The Hongkong and Shanghai Banking Corporation Limited, HSBC Bank USA, N.A., HSBC Holdings plc, HSBC North America Holdings Inc., and HSBC USA Inc.*

Mark A. Kirsch, Eric J. Stock, Jefferson E. Bell, Gibson, Dunn & Crutcher LLP, New York, NY, *for Defendants-Appellees UBS AG and UBS Securities Japan Co., Ltd.*

Amanda F. Davidoff, Sullivan & Cromwell LLP, Washington, DC, *for Defendants-Appellees ING Groep N.V., ING Bank N.V., and ING Capital Markets LLC.*

RICHARD J. SULLIVAN, *Circuit Judge*:

In 2016, two Cayman Islands investment funds filed a class action complaint against numerous banks (the "Banks"), alleging that the Banks had conspired to manipulate certain Singapore-based benchmark interest rates. It was not until a year later that the Banks discovered that the two plaintiff funds had been dissolved years earlier, and that the case was actually being prosecuted by a separate entity, Fund Liquidation Holdings LLC, which asserts that it was assigned the dissolved

6

entities' claims. Following that revelation, the district court (Hellerstein, *J.*) dismissed the case with prejudice for lack of subject-matter jurisdiction, reasoning that, because the action was initiated by non-existent parties, the case was a legal nullity and so could not be salvaged through Federal Rule of Civil Procedure 17.

On appeal, we are primarily tasked with deciding two issues: (i) whether the dissolved entities possessed Article III standing when the case was initiated, and, if not, (ii) whether Fund Liquidation is nevertheless able to join the action through Rule 17. We conclude that, although the dissolved funds lacked standing at the time the case was commenced, Article III was nonetheless satisfied because Fund Liquidation, the real party in interest, has had standing at all relevant times and may step into the dissolved entities' shoes without initiating a new action from scratch. As a result, we **VACATE** the district court's judgment, and **REMAND** the case for further proceedings.

## I. Background

The global financial system relies on a series of floating benchmark interest rates, many of which reflect the average cost that a bank incurs when borrowing

money from one of its peers.[1]  The most well-known example is the London Interbank Offered Rate, more commonly referred to as "LIBOR."  In recent years, many of the world's largest financial institutions have been accused of manipulating several of these benchmarks in their favor.  The implications of such manipulation can be staggering as these rates are used as reference points in countless financial instruments across the world and affect transactions collectively worth trillions of dollars.

This case concerns an alleged conspiracy by the Banks and others to manipulate two such benchmark rates:  the Singapore Interbank Offered Rate (referred to as "SIBOR") and the Singapore Swap Offered Rate (referred to as "SOR").[2]  The two rates are calculated by a trade group, the Association of Banks in Singapore, which is composed of various banks (including some of the defendant banks in this case).  Each day, an agent of that association calculates the two rates based, in part, on interest rate quotes submitted by a panel of banks that, again, include several of the defendants in this case (the "Panel").  Between 2007

---

[1] Because this appeal arrives before us at the pleading stage, we draw these facts from Fund Liquidation's complaint and accept them to be true. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 139 n.1 (2d Cir. 2010).

[2] Technically, Fund Liquidation alleges that the Banks manipulated three rates, the SOR benchmark and two SIBOR benchmarks, one denominated in U.S. dollars and another denominated in Singapore dollars.

and 2011, the Banks allegedly worked together to manipulate those two benchmark rates so that they would shift in directions that favored the Banks' financial positions. "The [alleged] effect of [the Banks'] conspiratorial price-fixing was to necessarily reduce the amount of interest paid to all holders of SIBOR- and SOR-based financial instruments." Fund Liquidation Br. at 8. Eventually, this conspiracy was uncovered in 2013 through an investigation spearheaded by the Monetary Authority of Singapore.

Three years later, on July 5, 2016, an initial class action complaint was filed against the Banks (and others) in the names of FrontPoint Asian Event Driven Fund, L.P. and Sonterra Capital Master Fund, Ltd. (together, the "Dissolved Funds"), two Cayman Islands investment funds that claimed to have held financial instruments that relied on the manipulated benchmark rates. Two critical pieces of information were omitted from this initial complaint. First, the complaint failed to disclose that the Dissolved Funds had apparently assigned (or, at least, attempted to assign) the rights to their claims to Fund Liquidation, and that it was really Fund Liquidation that was pulling the strings behind the scenes. Second, and perhaps more importantly, the pleadings failed to reflect that the Dissolved Funds were no longer in existence when the case was initiated – FrontPoint had

9

been dissolved nearly five years earlier, in November 2011, and Sonterra had been dissolved shortly thereafter, in December 2012.

On October 31, 2016, a first amended complaint was filed, which added additional claims under the Sherman Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and common law. As before, this complaint made no mention of Fund Liquidation and referred to the Dissolved Funds in the present tense as if they were still in existence. *See* J. App'x at 137 ("FrontPoint . . . *is* an investment fund" (emphasis added)); *id.* at 138 ("Sonterra . . . *is* an investment fund" (emphasis added)). About one year later, the district court dismissed most of the asserted claims, finding that the court lacked personal jurisdiction over the subset of defendant banks that were foreign entities, that Sonterra failed to demonstrate that it would be an efficient enforcer of the antitrust laws, and that the plaintiffs had failed to plead plausible antitrust, RICO, or common law claims. *See generally FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017). The district court refused, however, to dismiss FrontPoint's antitrust claims against the defendants that were members of the Panel, since those defendants submitted the allegedly fraudulent interest rate data directly to the Association of Banks in Singapore. *Id.* at *11. In

addition, the district court permitted the plaintiffs to file an amended pleading to correct the shortcomings in the first amended complaint. *See id.* at *17.

So, on September 18, 2017, a second amended complaint was filed.[3] It was only in this pleading that, for the first time, the plaintiffs clarified that the Dissolved Funds were no longer in operation. J. App'x at 312 ("FrontPoint . . . *was* an investment fund" (emphasis added)); *id.* at 313 ("Sonterra . . . *was* an investment fund" (emphasis added)). The Banks responded by filing a new motion to dismiss, which added a fresh set of grounds for dismissal, including the contention that the Dissolved Funds lacked capacity to sue in light of their dissolution. It was not until briefing and oral argument that the plaintiffs eventually explained that the Dissolved Funds had assigned their claims to Fund Liquidation, and that it was Fund Liquidation which was, and had always been, the real plaintiff behind the case. Fund Liquidation then requested to substitute into the action under Federal Rule of Civil Procedure 17(a)(3) as the real party in interest and asked that it be allowed to continue litigating FrontPoint's and Sonterra's claims in its own name.

---

[3] A corrected copy of the second amended complaint was filed one month later.

11

Around this time, some of the defendants (who have not appealed) decided to settle with Fund Liquidation. Those parties eventually executed binding term sheets and notified the district court.

On October 4, 2018, within weeks of those agreements being signed, the district court dismissed with prejudice the RICO claims and the antitrust claims asserted against certain defendants, but again permitted the plaintiffs to proceed on the common law claims and antitrust claims brought against those defendants who were members of the Panel. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263 (AKH), 2018 WL 4830087, at *11–12 (S.D.N.Y. Oct. 4, 2018). The district court also concluded that Fund Liquidation had received a full assignment of rights from FrontPoint and, as a result, granted leave for Fund Liquidation to submit a Third Amended Complaint under Rule 17(a)(3) so that it could join the action in its own name. *See id.* While the district court found that Sonterra had also assigned its claims to Fund Liquidation, it dismissed Sonterra's remaining claims (all of which were antitrust claims) with prejudice, reasoning that, because Sonterra had not transacted directly with any of the defendants, it was not an efficient enforcer of the antitrust laws. *See id.* at *6, *11–12.

A few weeks later, on October 26, 2018, Fund Liquidation filed a third amended complaint, naming as plaintiff "Fund Liquidation Holdings LLC, as assignee and successor-in-interest to FrontPoint."[4] *See* J. App'x at 603. The substantive allegations in this complaint were effectively identical to those in the second amended complaint, with the exception that Fund Liquidation added additional facts concerning the pre-suit assignment it received from FrontPoint.

The following month, the Banks moved to dismiss the new complaint, arguing, among other things, that Fund Liquidation could not substitute into the action under Rule 17(a)(3) because the case was a legal nullity from the outset – having been initiated in the names of dissolved corporate entities – and that, since the statute of limitations had now lapsed, Fund Liquidation's new complaint was untimely. The Banks also argued that FrontPoint did not adequately assign its antitrust claims to Fund Liquidation.

While Fund Liquidation contested both arguments on the merits, it indicated that it would seek to moot the issues by filing a proposed fourth amended complaint. In that proposed complaint, Fund Liquidation sought to join

---

[4] Sonterra's omission from the caption was a result of the district court's prior order, which directed Fund Liquidation "to amend the [case] caption . . . [to] reflect the rulings in th[e] [October 2018] opinion." *FrontPoint Asian Event Driven Fund*, 2018 WL 4830087, at *12.

13

two new class representatives, Moon Capital Partners Master Fund, Ltd. and Moon Capital Master Fund, Ltd. (together, the "Moon Funds"), which had transacted directly with the Banks and claimed to have been injured by the same scheme. According to Fund Liquidation, the Moon Funds would be ideal class representatives as they were not open to the same arguments concerning assignment and capacity that had thus far plagued Fund Liquidation. Separately, Fund Liquidation also sought preliminary approval of the settlement agreements that it had signed with some of the defendants.

On July 26, 2019, the district court adopted the Banks' nullity argument and dismissed the third amended complaint with prejudice on the grounds that the court had lacked subject-matter jurisdiction over the action from its outset, something, the district court concluded, that could not be cured. According to the district court: "[b]ecause [the Dissolved Funds] lacked capacity to sue, there was no real 'case or controversy' before the court and, consequently, no subject-matter jurisdiction." *Fund Liquidation Holdings LLC v. Citibank, N.A.*, 399 F. Supp. 3d 94, 103 (S.D.N.Y. 2019). For similar reasons, the court refused to approve the two settlement agreements that Fund Liquidation had signed with several of the defendants. *Id.* at 104. The district court also walked back its prior determination

14

and concluded that FrontPoint had not effectively assigned its claims to Fund Liquidation, meaning that even if Fund Liquidation could join the case through Rule 17, it would lack standing to assert FrontPoint's claims. *Id.* at 102–03. Lastly, the district court noted that even if it did possess jurisdiction over the case, the Moon Funds could not be named as class representatives as their claims were not subject to equitable tolling and so were untimely. *Id.* at 105.

This appeal followed.

## II. Appellate Jurisdiction

As an initial matter, we must decide whether we have jurisdiction over Sonterra's claims. The Banks argue that we do not because, as they see it, Fund Liquidation's notice of appeal was effective only as to FrontPoint's claims. Specifically, the Banks point out that the caption to the notice of appeal identifies only one plaintiff, "Fund Liquidation Holdings LLC, as assignee and successor-in-interest to FrontPoint," and that the body of the notice states simply that "Plaintiff" is appealing various orders. J. App'x at 926. Taken together, the Banks say that the notice of appeal failed to make clear that Fund Liquidation was appealing the dismissal of Sonterra's claims, which the Banks argue merits dismissal of that portion of the appeal.

15

Federal Rule of Appellate Procedure 3(c) governs the contents of a notice of appeal. The Rule requires that such notices do three things: (1) "specify the party or parties taking the appeal by naming each one in the caption or body of the notice"; (2) "designate the judgment, order, or part thereof being appealed"; and (3) "name the court to which the appeal is taken." Fed. R. App. P. 3(c)(1). "The requirement that a party seeking to appeal be specified in the notice of appeal is jurisdictional." *Gusler v. City of Long Beach*, 700 F.3d 646, 648 (2d Cir. 2012). Even so, Rule 3 is clear that an appeal should "not be dismissed for informality of form or title of the notice of appeal" if the identities of the parties seeking to appeal are nonetheless clear. Fed. R. App. P. 3(c)(4); *see also In re Motors Liquidation Co.*, 943 F.3d 125, 130 (2d Cir. 2019) (excusing a mistake in the notice of appeal because the identities of the appellants were "sufficiently clear to the parties and ascertainable to the court (with effort)"); *Gusler*, 700 F.3d at 648–49 (focusing Rule 3 inquiry on whether "it is manifest from the notice as a whole that the party wishes to appeal").

Here, Fund Liquidation technically complied with the letter of Rule 3. The notice of appeal identified the only party taking the appeal (Fund Liquidation), the orders that were the subject of the appeal (the order issued on July 26, 2019 and all other orders that were adverse to Fund Liquidation), and the court to which

16

the appeal was being taken (the Second Circuit). That is all that the text of

Rule 3(c)(1) requires of a notice of appeal to invoke our jurisdiction.

But even if Fund Liquidation's failure to expressly identify Sonterra in its

notice of appeal did run afoul of Rule 3, that deficiency would be excusable since

it is sufficiently clear from the body of the notice that Fund Liquidation intended

to appeal the dismissal of each of its claims against the Banks, not just those claims

that it allegedly received from FrontPoint. For starters, the body of the notice gave

no indication that Fund Liquidation was appealing only certain claims. To the

contrary, the notice stated that Fund Liquidation was appealing "*all* orders . . .

entered in the case that were adverse, either in whole or in part, to [it]." J. App'x

at 926 (emphasis added). Given the "liberal[] constru[ction]" that we give to such

notices, *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 55 (2d Cir. 2004), the natural

inference is that Fund Liquidation intended to appeal the dismissal of each of its

claims. That is particularly true here given that it was the district court, not Fund

Liquidation, that removed Sonterra from the case caption. S*ee FrontPoint Asian

Event Driven Fund*, 2018 WL 4830087, at *12. Moreover, the notice of appeal

pointed specifically to the July 26, 2019 order, which discussed Fund Liquidation's

17

argument that the case was not a nullity precisely *because* of Sonterra's claims. *Fund Liquidation Holdings*, 399 F. Supp. 3d at 104.

Fund Liquidation's notice of appeal therefore not only complied with the text of Rule 3, but also put the Banks on notice that Fund Liquidation intended to appeal the dismissal of the claims originally held by both FrontPoint *and* Sonterra. As a result, we have appellate jurisdiction over all claims raised on appeal.

## III.    Standard of Review

On appeal following a dismissal of a complaint for either lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or failure to state a claim under Rule 12(b)(6), we review the district court's decision *de novo*. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (subject-matter jurisdiction); *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014) (failure to state a claim). As part of that review, we "accept[] as true all material factual allegations of the complaint[] and draw[] all reasonable inferences in favor of the plaintiff." *Carter*, 822 F.3d at 56–57 (internal citations, quotation marks, and alterations omitted); *Krys*, 749 F.3d at 128 (same).

Separately, we review denials of motions for leave to amend, to substitute into an action under Rule 17(a), or to approve a class action settlement agreement

for abuse of discretion. *See Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 226 (2d Cir. 2018) (motion to substitute); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Care, L.L.C.*, 504 F.3d 229, 246 (2d Cir. 2007) (approval of class action settlement); *Kropelnicki v. Siegel*, 290 F.3d 118, 130 (2d Cir. 2002) (leave to amend). But where, as here, such denials were based on decisions of pure law, they are functionally reviewed *de novo*, as a decision premised on a legal error is necessarily an abuse of discretion. *See Klein*, 906 F.3d at 226; *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 769 (2d Cir. 2016).

## IV.   Discussion

This case requires us to engage in a two-step inquiry. First, we must determine whether the Dissolved Funds had Article III standing when the case was initiated in their names. If so, then that would seem to end the matter in Fund Liquidation's favor. *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20–21 (2d Cir. 1997) (indicating that courts have the power to permit a real party in interest to join an action under Federal Rule of Civil Procedure 17 where the originally named plaintiff had standing). But if the Dissolved Funds lacked standing at that time, we must decide whether Fund Liquidation can nevertheless substitute into the action in their place.

19

**A.     The Dissolved Funds Lacked Article III Standing at the Case's Initiation**

The Banks argue that the Dissolved Funds lacked standing when the original complaint was filed because, by that time, the Dissolved Funds had already (i) "disavowed any interest" in the case, having assigned their claims to Fund Liquidation, Banks Br. at 34, and (ii) been dissolved under Cayman Islands law and so had no legal existence. We address each argument in turn.

**1.     A Pre-Suit Assignment Does Not Extinguish Article III Standing**

There is little merit to the Banks' initial argument that the Dissolved Funds' pre-filing assignment of their claims stripped the Dissolved Funds of Article III standing. As several of our sister circuits have explained, there is a distinction between having standing to pursue a claim and being a real party in interest with respect to that claim, only the latter of which is implicated by an assignment. *See First Am. Title Ins. Co. v. Nw. Title Ins. Agency*, 906 F.3d 884, 890 (10th Cir. 2018); *Norris v. Causey*, 869 F.3d 360, 366–67 (5th Cir. 2017); *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 730 (6th Cir. 2016) (holding that "one who sells his interest in a cause of action is not deprived of Article III standing, but . . . is [instead] susceptible to a real-party-in-interest challenge"); *Dunn v. Advanced Med. Specialties, Inc.*, 556 F. App'x 785, 789–90 (11th Cir. 2014); *Whelan v. Abell*, 953 F.2d 663, 671–72 (D.C. Cir. 1992); *Apter v. Richardson*, 510 F.2d 351, 353 (7th Cir. 1975); *see also* 6A Charles

20

Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1542 (3d ed.) (hereinafter, "Wright & Miller") (explaining the differences between possessing standing and being a real party in interest); *id.* § 3531 n.10 (same). That distinction makes sense.

Article III standing has three elements: (i) "the plaintiff must have suffered an injury in fact" that is "concrete and particularized" as well as "actual or imminent"; (ii) "there must be a causal connection between the injury and the conduct complained of"; and (iii) "it must be likely . . . that the injury will be redressed by a favorable judicial decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). An assignment has no bearing on the first two elements. After all, an assignment does not erase an injury – it is simply an exchange of legal entitlement about who can seek to rectify that injury in court. *See Cranpark*, 821 F.3d at 730–31 (reasoning that "it can[not] seriously be contended that [the assignor] has suffered *no* injury in fact" following an assignment). Nor can an assignment sever a pre-existing causal link between that injury and the defendant. So that just leaves redressability. And given the Supreme Court's analysis in *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008), that too is unimpaired by an assignment.

Redressability, *Sprint* explains, focuses "on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation," *id.* at 287, not on whether the plaintiff itself is "entitled to the relief sought," *Cranpark*, 821 F.3d at 731 (internal quotation marks omitted). Here, the Dissolved Funds' alleged injury is no less redressable through an award of damages simply because legal title to their claims is now owned by someone else.

To be sure, our Circuit's pronouncements on this issue are a bit of a mixed bag. For instance, both *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir. 1984), and *Valdin Investments Corp. v. Oxbridge Capital Management, LLC*, 651 F. App'x 5, 7 (2d Cir. 2016), held that assignment can result in a loss of standing. But *Aaron Ferer* predates *Sprint*, and *Valdin* is a non-precedential summary order, so neither case is binding on us. *See Doscher v. Sea Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016) (explaining that we are no longer bound by a prior panel's opinion when an intervening Supreme Court decision has "broken the link on which . . . [the] prior decision [was premised] or undermined an assumption of that decision" (internal citations, quotation marks, and alterations

22

omitted)); 2d Cir. R. 32.1.1(a) ("Rulings by summary order [lack] precedential effect.").[5]

A closer question, however, is posed in the wake of *W.R. Huff Asset Management Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008). There, we held that "*Sprint* makes clear that the minimum requirement for an injury-in-fact is that the plaintiff have *legal title to, or a proprietary interest in*, the claim." *Id.* at 108 (emphasis added). Taken at face value, that statement would seem to suggest that retaining legal title to a claim is a constitutional requirement of standing. But there is good reason not to read *W.R. Huff* so literally. First, the case concerned whether a party has standing to assert another entity's claim simply because it holds a power of attorney. *Id.* at 103. Like the Sixth Circuit, we conclude that the statement is best interpreted as limited to that context, and should not be construed to imply that a "transfer [of a claim] somehow erase[s] the transferor's injury." *Cranpark*, 821 F.3d at 731 (distinguishing *W.R. Huff*). And second, we have made clear that the prohibition on raising another's legal rights is a *prudential* rule of standing and

---

[5] Although we are not bound by the unpublished and non-precedential ruling in *Valdin*, we do not break from that panel's decision lightly. *See L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 123 n.17 (2d Cir. 2016) (cautioning that "[d]enying summary orders precedential effect does not mean that the [C]ourt considers itself free to rule differently in similar cases" (internal quotation marks omitted)). But as this issue presents a purely legal question of some importance, we conclude that *Valdin* does not represent the law of our Circuit on this issue, and so hold in this opinion.

distinct from the requirements found within Article III itself. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016).

In short, then, we conclude that the Dissolved Funds' pre-suit assignment of their claims does not pose a constitutional roadblock after *Sprint*. So that leaves only their pre-suit dissolution.

### 2. The Dissolved Funds' Pre-Suit Dissolution Extinguished Both Their Legal Existence and Their Article III Standing

Corporate dissolution implicates two potentially distinct legal concepts: capacity to sue and legal existence. We agree with Fund Liquidation that the former is non-jurisdictional in nature. Capacity to sue addresses only whether a person or company that possesses an enforceable right may act as a litigant. *See Horowitz v. 148 S. Emerson Assocs. LLC*, 888 F.3d 13, 19 n.4 (2d Cir. 2018). And although it is "allied with . . . the question of standing," capacity is "conceptually distinct." 59 Am. Jur. 2d Parties § 26; *see also Allan Applestein TTEE FBO D.C.A. v. Province of Buenos Aires*, 415 F.3d 242, 245 (2d Cir. 2005) (demonstrating that a lack of capacity is non-jurisdictional by permitting the defense to be waived); *E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co.*, 160 F.3d 925, 935–36 (2d Cir. 1998) (same); *Am. Sports Radio Network, Inc. v. Krause* (*In re Krause*), 546 F.3d 1070, 1072 n.2 (9th Cir. 2008) ("[W]e note that it is capacity, not standing, which is at issue.").

24

The same, however, cannot be said for legal existence. Fund Liquidation disagrees, suggesting that "corporate 'existence' has no valence apart from the . . . issue of corporate capacity to sue." Reply Br. at 13. While there has admittedly been some disagreement among district courts on this issue,[6] we conclude that Fund Liquidation's position is incorrect.

To start, the Federal Rules of Civil Procedure differentiate between corporate existence and capacity. For instance, Rule 17(b)(3)(A) permits courts to imbue unincorporated associations and partnerships with the capacity to sue. But this power does not extend to entities that lack legal existence. *See Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475, 477 (8th Cir. 2001) (explaining that "the questions of legal or juridical existence and capacity to sue and be sued are distinct, and that a group of persons working together for a common purpose must first be found to have legal existence before the question of capacity to sue or be sued can arise"); *see also Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 110 (S.D.N.Y. 1992)

---

[6] *Compare ChinaCast Educ. Corp. v. Chen Zhou Guo*, No. 15-cv-5475 (AB), 2016 WL 10653269, at *1–2 (C.D. Cal. Jan. 8, 2016) (explaining that, "[u]nlike a case where a corporation exists in some form but perhaps lacks a technical capacity to sue in a particular forum, Plaintiff's own allegations indicate that Plaintiff may not legally exist under Delaware law"), *and Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 22 (D.D.C. 2004) (concluding that the plaintiff "lacks standing to maintain this action" because its "corporate charter was forfeited" prior to the suit's initiation), *aff'd*, 173 F. App'x 825 (Fed. Cir. 2006), *with XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 65 (D.D.C. 2015) (holding that dissolved corporate entities still possess Article III standing).

25

(holding that "[c]apacity to be sued and legal existence are separate and distinct concepts"), *aff'd on other grounds*, 996 F.2d 1353 (2d Cir. 1993). Likewise, Rule 9 lists the two terms independent of one another, indicating that they are "distinct concepts" with distinct meanings.[7] Wright & Miller § 1292.

Fund Liquidation's primary response to this argument is to identify various prior cases in which dissolved corporate entities were not thrown out of court for lack of standing. But a close inspection of those cases reveals that each of the corporate entities in question still had some vestige of legal existence at the action's inception, even if they lacked the capacity to sue.

Take, for example, *Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Building Corp.*, 302 U.S. 120 (1937). After finding that the dissolved entity lacked

---

[7] Fund Liquidation points out that Rule 9(a)(1)(C) does not require the legal existence of a corporate entity to be pleaded affirmatively in every case, which Fund Liquidation sees as contrary to the notion that corporate existence is a prerequisite to standing. We disagree. We read Rule 9 as embodying the goal of the federal rules to "simplif[y]" pleading requirements. Wright & Miller § 1292. Because questions of legal existence will "rarely [be] in dispute," it is reasonable to require a "specific denial" to raise the issue. *Id.* (internal quotation marks omitted). Indeed, Fund Liquidation's interpretation of Rule 9 would be particularly hard to swallow in cases, unlike this one, where the original plaintiff *never* existed whatsoever. Because one elemental precondition for meeting the case-or-controversy requirement is a claimant with standing, *Lujan*, 504 U.S. at 560–61, it must be that the non-existence of the supposed claimant is a problem of constitutional magnitude, *see In re 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016) (holding that "[t]here is no plaintiff with standing if there is no plaintiff"); *see also LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 953 (9th Cir. 2020) (same); *House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 787 (4th Cir. 2019) (same).

capacity, the Supreme Court reversed the lower court's decision rather than vacate it for want of jurisdiction. *Id.* at 127–30. Under Illinois law, however, the dissolved company still possessed some legal identity when it initiated the reorganization proceedings at issue in the case. Specifically, Illinois law granted corporations the right to wind up business for two years after dissolution, which included the right to prosecute and defend legal claims. *Id.* at 122–24. If a corporation began a lawsuit (or was sued) during those two years, it could see the case through to completion. *Id.* at 130 (Cardozo, *J.*, dissenting). And, sure enough, the dissolved entity in *Chicago Title & Trust* was still litigating a case instituted during that two-year windup period when it filed its petition for reorganization. *Id.* at 130–31. So even though the company lacked capacity, Illinois law still recognized its legal existence – at least, for certain purposes.

The same is true of the other cases that Fund Liquidation cites on this issue. In each case, the courts indicated that state law granted the dissolved entities continued existence even after dissolution so that they could wind up their affairs, which included seeking liquidation under the bankruptcy code. *See Cedar Tide Corp. v. Chandler's Cove Inn, Ltd. (In re Cedar Tide Corp.)*, 859 F.2d 1127, 1131–32 (2d

Cir. 1988); *In re Superior Boat Works, Inc.*, 438 B.R. 878, 881–83 (Bankr. N.D. Miss. 2010).

Here, by contrast, the record before us indicates that the Dissolved Funds had neither capacity to sue *nor* legal existence following their dissolution. According to the affidavit of John Michael Harris (the Banks' Cayman Islands counsel), following dissolution, Cayman Islands companies and partnerships "no longer ha[ve] any legal personality and cannot take any lawful action," meaning that any "proceedings brought in [their] name[s] . . . are a nullity." J. App'x at 391. And unlike most U.S. jurisdictions, the Cayman Islands do not permit a dissolved entity to "be restored." *Id*. at 390.

While Fund Liquidation submitted its own affidavit on the status of dissolved Cayman Islands entities, *see* ECF No. 250-4, Dkt. No. 16-cv-5263, that affidavit did not contradict the core components of the Harris affidavit that are relevant here – namely, that the Dissolved Funds have no legal existence. Fund Liquidation's affidavit instead focused on the fact that the Dissolved Funds' *assignment* survived their dissolution, and that Fund Liquidation, as assignee, has a right to sue in the Dissolved Funds' names. *Id.* at 11. But whether Cayman Islands law would allow for an assignment and power of attorney to survive

dissolution says little about whether the Dissolved Funds have legal existence for purposes of Article III standing. In light of this record, and because Fund Liquidation bears the burden of demonstrating that the district court possesses subject-matter jurisdiction, *Carter*, 822 F.3d at 56, we conclude that the Dissolved Funds did not legally exist when the case was filed.[8]

And without legal existence, the Dissolved Funds lacked standing to sue. After all, "[t]he most elemental requirement of adversary litigation is that there be two or more parties," meaning that "[a]bsent a plaintiff with legal existence, there can be no Article III case or controversy." *House v. Mitra QSR KNE LLC*, 796 F. App'x 783, 787 (4th Cir. 2019) (quoting Wright & Miller § 3530); *see also LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 953 (9th Cir. 2020) (concluding that

---

[8] Although the legal existence of a foreign corporate entity is ordinarily "determined by the laws of the country where it has been created," *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 698 (2d Cir. 1970), a slight choice-of-law wrinkle arises here given that FrontPoint (unlike Sonterra) was a partnership, not a corporation. As with corporations, it might seem natural to look to the law of the jurisdiction where the organization was created to determine whether a partnership has legal existence. But Federal Rule of Civil Procedure 17(b)(3) suggests that a partnership's capacity to sue is governed by the law of the state in which the *court* is located (here, New York). And if New York law applies to determinations of capacity, it's possible that the same is true when determining existence. Fortunately, New York law would itself look to Cayman Islands law to resolve this issue, meaning that it makes no difference which law governs. *See* N.Y. Partner Law § 121-901 (stating that "the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its limited partners"); *see also Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404, 410 (S.D.N.Y. 2018) (looking to law of the jurisdiction under which the partnership was formed to determine whether the partnership has capacity to sue); *Residential Liquidating Tr. v. Mortg. Invs. Grp., Inc. (In re Residential Cap., LLC)*, 527 B.R. 590, 595–96 (Bankr. S.D.N.Y. 2015) (same).

it is "obvious" that "the dead lack the capacities that litigants must have to allow for a true Article III case or controversy"); *Hernandez v. Smith*, 793 F. App'x 261, 265 (5th Cir. 2019) (plaintiff "did not have standing to sue because she was deceased"); *In re 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016) ("[O]ne elemental precondition for meeting the case-or-controversy requirement is a claimant with standing.  There is no plaintiff with standing if there is no plaintiff." (internal citation omitted)); *cf. Billino v. Citibank, N.A.*, 123 F.3d 723, 725 (2d Cir. 1997) (explaining that it was a jurisdictional error for the appeal to be brought only in the name of a dead party as a "deceased plaintiff simply no longer has a cognizable interest in the outcome of litigation").

Before moving on, one component of this conclusion bears at least some additional discussion.  Specifically, Fund Liquidation suggests that, by declaring legal existence under state (or, in this case, foreign) law to be a condition of Article III standing, we are running afoul of the Supreme Court's directive that "standing in federal court is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013); *see also Chicago Title & Tr.*, 302 U.S. at 128 (explaining that a state "cannot keep [a] corporation alive for its own purposes and deny it life for federal purposes"); *Chapman v. Barney*, 129 U.S. 677, 682 (1889)

(holding that "although it may be authorized by the laws of the state of New York to bring suit in the name of its president, that fact cannot give the [plaintiff partnership] power, by that name, to sue in a federal court"). Undoubtedly, there are limits on how state law can influence issues of constitutional standing. But, despite those limits, state law is not irrelevant simply because standing is at issue.

Federal law sets the parameters on what is necessary to possess Article III standing, and while state law can neither enlarge nor diminish those requirements, it can supply the answers to certain antecedent questions relevant to whether those federal requirements are satisfied. Indeed, this sort of reliance on state law happens all the time.

For instance, state law often defines the legal relationships between people and things, which are necessary to understanding whether a particular plaintiff has suffered an injury in fact. A simple example of this is property ownership, which is both an issue of state law and often a foundational standing requirement in a federal takings case. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 729 n.10 (2010) (explaining that "the claim here is ripe insofar as Article III standing is concerned, since (accepting petitioner's version of Florida law as true) petitioner has been deprived of property"); *U.S. Olympic Comm. v.*

*Intelicense Corp., S.A.*, 737 F.2d 263, 268 (2d Cir. 1984) (holding that "[o]nly the owner of an interest in property at the time of the alleged taking has standing to assert that a taking has occurred").

But that's just one example; courts rely on state law in a variety of other contexts to assess whether a plaintiff satisfies Article III. *See, e.g.*, *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (looking to Virginia state law to determine whether the state legislature had the authority to litigate on the State's behalf); *Torres v. $36,256.80 U.S. Currency*, 25 F.3d 1154, 1158–60 (2d Cir. 1994) (looking to state law concerning constructive trusts to resolve an issue of standing); *Amrhein v. eClinical Works, LLC*, 954 F.3d 328, 334 (1st Cir. 2020) (recognizing that "Article III can be satisfied solely by virtue of an invasion of a recognized state-law right" (internal quotation marks omitted)); *Scanlan v. Eisenberg*, 669 F.3d 838, 842 (7th Cir. 2012) (explaining that "the nature and extent of [the plaintiff's] interest[,] . . . and therefore[] whether that interest can form the basis of a federal suit, depend[s] on [state] law" (internal citations omitted)); *FMC Corp. v. Boesky*, 852 F.2d 981, 993 (7th Cir. 1988) (holding that "[p]roperly pleaded violations of state-created legal rights . . . must suffice to satisfy Article III's injury requirement").

So, in a case like this one, federal law sets the ground rule that a plaintiff corporation or partnership must have legal existence to have constitutional standing. Whether a particular corporation or partnership satisfies that requirement, however, turns on an examination of state law. And here, Cayman Islands law is clear: the Dissolved Funds had no legal existence when the complaint was filed. As a result, the Dissolved Funds lacked Article III standing when the case was initiated in their names. The next question, then, is what to make of that fact.

## B. Fund Liquidation Nonetheless Satisfied Article III

We hold today that Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed. If that party (the real party in interest) is not named in the complaint, then it must ratify, join, or be substituted into the action within a reasonable time. Only if the real party in interest either fails to materialize or lacks standing itself should the case be dismissed for want of subject-matter jurisdiction.

Admittedly, this is not a view adopted by many courts. The far more common view is the so-called "nullity doctrine" exemplified by *Zurich Insurance Co. v. Logitrans, Inc.*, 297 F.3d 528 (6th Cir. 2002), which says that a case initiated in

33

the name of a plaintiff that lacks standing is an incurable nullity. But, for the reasons explained below, we conclude that neither Article III nor our Court's past precedent requires us to adopt this doctrine. And because "the concerns animating [Article III standing] are absent" where a real party in interest exists and is willing to join an action, *Cortlandt St. Recovery Corp. v. Hellas Telecomms. S.à.r.l.*, 790 F.3d 411, 427 (2d Cir. 2015) (Sack, *J.*, concurring), we conclude that Article III is satisfied in this case.

**1. Our Precedent Does Not Require Application of the Nullity Doctrine**

Our court has touched on the nullity doctrine in only a few published decisions. The natural starting point is *Cortlandt Street Recovery Corp. v. Hellas Telecommunications S.à.r.l.*, 790 F.3d 411 (2d Cir. 2015). There, the district court determined that an action instituted by a plaintiff that lacked standing was a nullity at inception, and so could not be salvaged through Rule 17. *Id.* at 422–23. Ultimately, we resolved the case without deciding that question, but, in a concurring opinion, Judge Sack (also the author of the unanimous panel opinion) explained that he would reject the nullity doctrine as it is "highly technical [and] without [a] meaningful purpose." *Id.* at 427 (Sack, *J.,* concurring) (internal quotation marks omitted).

34

Despite *Cortlandt*'s refusal to decide this issue, subsequent panels have twice cited *Cortlandt* in support of dicta suggesting that the nullity doctrine is the law of the Circuit. *See Klein*, 906 F.3d at 227 n.7; *DeKalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 412 & n.121 (2d Cir. 2016). The explanation for this strange leap in law is simple: each of those opinions mistakenly quotes language from *Cortlandt* as if it were part of *Cortlandt*'s holding, when, in fact, it was merely a summary of the district court's reasoning that the panel in *Cortlandt* expressly refused to adopt. *Compare Klein*, 906 F.3d at 227 n.7, *and DeKalb*, 817 F.3d at 412 n.121, *with Cortlandt*, 790 F.3d at 423, *and id.* at 425–27 (Sack, *J.*, concurring).[9] As a result, none of these cases constitutes binding precedent on the subject.

Interestingly, the closest that we have come to adopting the nullity doctrine appears to have been in *Isthmian Lines, Inc. v. Rosling*, 360 F.2d 926 (2d Cir. 1966), a case that *Cortlandt* (and the parties here) did not address. That case was a wrongful death suit brought in the name of a widow, both in her individual capacity and in her capacity as administrator of her husband's estate. As it turned out, the widow had herself died before the complaint was filed, and it was her daughter who was actually the administrator of the decedent's estate. We ultimately permitted the

---

[9] Our non-precedential summary order in *Valdin Investments* is subject to the same criticism. *See* 651 F. App'x at 7.

35

daughter to amend the complaint to name herself as administrator, but only because the estate (unlike the widow) was "alive" at the time the complaint was filed:

> [The pleading] was captioned in the alleged name of the Administratrix of the Estate of Charles Richard Washington as well as herself "individually," although this latter status was a nullity because of her prior decease. The respondent thus had notice that the "Estate" was suing and notice of the facts upon which the claim was based. Although "a proceeding begun in the name of a deceased plaintiff is a nullity" (*Karrick v. Wetmore*, 22 App.D.C. 487 [(D.C. Cir. 1903]), the Estate here was not deceased. . . . [T]he situation was that of an Estate suing which did not have a then-appointed administrator.

*Id.* at 927–28.

To be sure, this opinion offers some support for the nullity doctrine. But it is not binding on us: the nullity point was mere dicta because the estate's standing to bring the claim independently supported the holding. And when assessed on its own terms, *Isthmian Lines* is not particularly persuasive as it effectively begins and ends its nullity analysis with a quote from *Karrick v. Wetmore*, a D.C. Circuit decision from 1903. *Karrick*, in turn, relied primarily on state court and English court opinions, and the Supreme Court's decision in *Harter v. Twohig*, 158 U.S. 448,

454 (1895), which itself focused on Nebraska state law, not the demands of Article III. *See Karrick*, 22 App. D.C. at 493.

Thus, whether to adopt the nullity doctrine is still an open question in our Circuit.

### 2. Article III Does Not Require the Nullity Doctrine

The central conceit of the nullity doctrine is that an action commenced in the name of a plaintiff who lacks Article III standing is rendered an incurable nullity even where a real party in interest both has standing and is willing to join the suit. That foundational view is immediately suspect given its tension with how pleading requirements have evolved over time.

At early common law, courts of law recognized only those plaintiffs whose *legal* rights had been affected by the act of the defendant, a group into which courts determined assignees did not fall. *See* Charles E. Clark & Robert M. Hutchins, *The Real Party in Interest*, 34 Yale L.J. 259, 259–60 (1925) (hereinafter, "Clark, *Real Party in Interest*"); Wright & Miller § 1545. Perhaps because cases had to be brought in the name of the nominal plaintiff, identifying the party for whose "use" a case was brought was not necessary. *See Clarksons v. Doddridge*, 55 Va. 42, 46 (1857) ("It is usual, when an action is brought in the name of one person for the use of another,

37

to state the fact . . . .  But this is not necessary.  The statement is no material part of the pleadings."); *see also United States v. Abeel*, 174 F. 12, 19 (5th Cir. 1909) ("[A] suit for the breach can[] be maintained by the United States without a statement that the suit is for the use of some one named in the petition."); *Boston El. Ry. Co. v. Grace & Hyde Co.*, 112 F. 279, 284 (1st Cir. 1901) ("[T]he expression of [] use may be disregarded as surplusage. . . .  [S]uch a phrase has no force to make an issue different from what it would have been if the phrase had been left out."); Edson R. Sunderland, *Cases on Procedure, Annotated:  Common Law Pleading* 731 n.77 (Callaghan & Co., 1914) (commenting, in reference to the Supreme Court's decision in *Welch v. Mandeville*, 14 U.S. (1 Wheat.) 233 (1816), that the "[r]ecord need not disclose real plaintiff" (italics omitted)).

Eventually, jurisdictions began to abandon this approach in favor of "code pleading."  Clark, *Real Party in Interest* at 259.  Under this new pleading formulation, cases could "be prosecuted in the name of the real party in interest," which was defined to be the assignee and not the assignor.  *Id.* at 259, 264.  But jurisdictions split on whether proceeding in the name of the assignor was still permitted.  In some, *only* the assignee (that is, the real party interest) could bring suit.  *Id.* at 261 (explaining that the "[t]he express language of the [New York] Code

38

was that [nearly] every action must be prosecuted in the name of the real party in interest" (internal quotation marks and footnote omitted)); *id.* at 266 (noting that "[t]he real party in interest provision is . . . properly construed in most states as imperative; the assignee and he alone may sue"). In others, it was up to the real party in interest to choose between suing in its own name or in the name of the assignor. *Id.* at 264–66; *see also Carozza v. Boxley*, 203 F. 673, 677 (4th Cir. 1913) (noting that "suit may be brought in one of three ways – in the name of the original obligee or payee, in his name for the use of the assignee, or in the name of the assignee alone"); Roland F. Johnson, *Equity – Assignment of Choses In Action – Suit In Whose Name*, 17 Tex. L. Rev. 183, 185 (1939) (explaining that in *Merlin v. Manning*, 2 Tex. 351 (1847), the Texas Supreme Court made clear that an "assignee could sue either in his own name *or* in the name of his assignor" (emphasis added)). In adopting Federal Rule of Civil Procedure 17, Congress sided with the former approach, clarifying that cases *had* to be prosecuted in the name of the real party in interest, not the nominal plaintiff. *See* Fed. R. Civ. P. 17.

This evolution of pleading practices suggests two things. First, the rule concerning which party's name a case must be prosecuted under (either the nominal plaintiff or the real party in interest) is non-jurisdictional. After all, if it

were jurisdictional, it's not clear how it could be changed over time without offending the Constitution. Moreover, treating this as a jurisdictional issue would be somewhat inconsistent with the directive in Rule 17(a)(3) that a case cannot be dismissed "until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."

Second, if we can alter the party in whose name a case must be prosecuted without offending Article III, it stands to reason that failing to initially name the correct party is not itself a constitutional problem. In other words, there appears to be no constitutional magic behind whether the name of a nominal plaintiff or a real party in interest is initially put in the caption of a pleading. Article III would therefore seem to be satisfied so long as the real party in interest is willing to join the case and has had standing since the case's inception. When viewed this way, filing a complaint in the name of a deceased or non-existent nominal plaintiff is akin to an error in the complaint's *allegations* of jurisdiction. And it is well-understood that a plaintiff may cure defective jurisdictional allegations, unlike defective jurisdiction itself, through amended pleadings. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (distinguishing between "[t]he state of things and the originally alleged state of things"); *Pressroom Unions-Printers League Income*

40

*Sec. Fund. v. Cont'l Assur. Co.*, 700 F.2d 889, 893 (2d Cir. 1983) (explaining that 28 U.S.C. § 1653 "allows amendment only of defective *allegations* of jurisdiction" but "does not provide a remedy for defective jurisdiction itself" (internal quotation marks omitted)).

The thornier question is whether a complaint filed in the name of a non-existent entity, on behalf of an unidentified real party in interest, meets the requirement that "the party invoking jurisdiction ha[ve] the requisite stake in the outcome when the suit [i]s filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008); *see also Lujan*, 504 U.S. at 570 n.5 (explaining that "standing is to be determined as of the commencement of suit"). Although it may not seem immediately intuitive, we conclude that the answer is "yes."

The real party in interest is the party with the legal title to the claim asserted and is the party with the stake in the controversy that is being used to invoke the court's jurisdiction. Why, then, should jurisdiction to hear the controversy turn on whether the *nominal* plaintiff has standing? That would be nonsensical. Indeed, in other jurisdictional contexts, we often ignore nominal plaintiffs and look only to the party with a real interest in the controversy. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80–81 (2d Cir. 2005)

(recognizing that nominal parties are often ignored for diversity purposes and explaining that this rule has a "rough symmetry" to the real-party-in-interest concept embodied by Rule 17(a) (internal quotation marks omitted)). And since Rule 17(a)(3) is clear that joinder of the real party in interest relates back to the "original[] commence[ment]" of the suit, this approach is consistent with the directive that standing must exist at the case's inception.

Further supporting this view is the fact that joining an assignee does not "substitute a new cause of action over which there is subject-matter jurisdiction for one in which there is not." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 161 (2d Cir. 1998). Rather, a real party in interest who has been assigned a claim is the functional equivalent of the original plaintiff – an assignee "step[s] into the shoes of the assignor." *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 75 n.12 (2d. Cir. 2013) (internal quotation marks omitted). So even though Fund Liquidation is replacing the Dissolved Funds as the named party, it is prosecuting the *Dissolved Funds'* claims. *See In re Ace Sec. Corp. RMBS Litig.*, No. 13-cv-1869 (AJN), 2015 WL 1408837, at *7 (S.D.N.Y. Mar. 26, 2015) ("Here, there is neither a new cause of action nor a new party. Nor would the proposed changes . . . cause the amended complaint to have the characteristics of a new

42

lawsuit. The Trustee is the functional equivalent of the Trust for the purpose of conducting this litigation." (internal quotation marks omitted)).[10]

In short, the boundaries of Article III are not as rigid as the Banks suggest. Indeed, while Fund Liquidation's presence and standing ensured that there was a live controversy when the action was initiated, numerous courts have made clear that, in certain instances, subject-matter jurisdiction can even be obtained after a case's initiation and given retroactive effect through procedural rules.

Diversity jurisdiction is one such example. Even if complete diversity – and thus jurisdiction – is lacking at a case's inception, rather than dismiss the case as a nullity, the court may drop any dispensable parties that are obnoxious to its jurisdiction. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 574 (2004); *see also E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 163 (2d Cir. 2001) (explaining that "once subject matter jurisdiction is 'cured' by an amendment [speaking about a diversity defect], courts regularly have treated the defect as

---

[10] In this way, the substitution of an assignee into an action is not like the situation discussed in the Advisory Committee Note to the 1966 amendment to Rule 17, in which a lawyer files an action in the name of a fictitious person "in the hope that at a later time the attorney filing the action may substitute the real name of the real personal representative of a real victim, and have the benefit of suspension of the limitation period." Fed. R. Civ. P. 17 Advisory Committee's note to 1966 amendment. Likewise, the case before us today differs from a situation like *Zurich Insurance*, in which the originally named plaintiff never possessed a claim against the defendant. *See* 297 F.3d at 532.

having been eliminated from the outset of the action"). Cases involving Federal Rule of Civil Procedure 15(d) provide additional examples. While we have never taken a position on the issue (and do not do so here), other circuits have declared that "events occurring after the filing of a complaint may cure a jurisdictional defect that existed at the time of initial filing." *Saleh v. Sulka Trading Ltd.*, 957 F.3d 348, 354 & n.7 (2d Cir. 2020) (collecting cases). Even the Supreme Court has suggested that Rule 15(d) may be used in this fashion. *See Mathews v. Diaz*, 426 U.S. 67, 75 & n.8 (1976).[11]

Of course, the cases cited above concerned sub-constitutional jurisdictional problems. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 829 n.1 (1989) (acknowledging that *complete* diversity is a statutory, not constitutional, requirement); *Mathews*, 426 U.S. at 75 (discussing a statutory condition on jurisdiction). And at least one other Circuit has suggested, albeit without explanation, that whether a jurisdictional defect is of constitutional character might be relevant to determining if it can be cured retroactively. *See Yan v. ReWalk*

---

[11] In *Mathews*, a Medicare applicant filed his Part B application only after he was joined as a plaintiff in an amended complaint. Although 42 U.S.C. § 405(g) made filing such an application a "nonwaivable condition of jurisdiction," the Supreme Court stated that it had "little difficulty" in holding that the district court had jurisdiction over the plaintiff's claim. 426 U.S. at 75. Citing Rule 15(d), the Court explained that "[a] supplemental complaint in the [d]istrict [c]ourt would have eliminated this jurisdictional issue." *Id.* at 75 & n.8.

*Robotics Ltd.*, 973 F.3d 22, 39 n.6 (1st Cir. 2020) (noting that two of the three panel members "limit their joining in this portion of the opinion on the basis that the standing defect in this case may be viewed as a lack of statutory standing"). But there are some examples of true-blue constitutional defects being cured through procedural rules after a complaint was filed.

For instance, in *Northstar Financial Advisors Inc. v. Schwab Investments*, the plaintiff filed a class action lawsuit on behalf of investors without owning any shares in the investment fund that it was suing or having obtained an assignment from those investors, meaning that the plaintiff had not suffered an injury when it filed suit. 779 F.3d 1036, 1043 (9th Cir. 2015). It was not until four months later that the plaintiff secured an assignment. *Id.* at 1043–44. Nevertheless, the district court permitted the plaintiff to file a supplemental pleading under Rule 15(d). *Id.* at 1044–45. The Ninth Circuit affirmed, concluding that requiring the plaintiff to start a new case would be needlessly formal. *Id.* at 1044–48. Other circuits have reached similar conclusions. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (holding that "a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint"); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1337 (Fed.

Cir. 2008) (concluding that the status of the plaintiff's Article III standing should be decided based on the allegations in the amended complaint, included allegations that concerned events that occurred after the case was initiated).

The Banks' primary authority in favor of the nullity doctrine – the Fourth Circuit's unpublished decision in *House v. Mitra QSR KNE LLC* – brings little to the table. To start, *House* posits that "[o]nly an actual and live plaintiff can assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult questions." 796 F. App'x at 787 (internal quotation marks and alterations omitted). But that role is filled whenever there is a real party in interest ready and willing to join the action.

Next, *House* points out that Rule 17 permits a real party in interest to substitute into "an action," *id.* at 790 (quoting Fed. R. Civ. P. 17(a)(3)), and reasons that a case instituted by a non-existent party is not an action at all. But what the Federal Rules call an "action" is something that exists independent of subject-matter jurisdiction. In fact, Rule 12(h)(3) states that a court "must dismiss the *action*" if it determines that it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3) (emphasis added). And Rule 3 says that "[a] civil action is commenced by filing a complaint with the court," an event that occurs well before any decision

46

over subject-matter jurisdiction is made. Fed. R. Civ. P. 3. *House*'s analysis is also in tension with the "wide and flexible content given to the concept of action under the [federal] rules." *Hackner v. Guar. Tr. Co. of N.Y.*, 117 F.2d 95, 98 (2d Cir. 1941) (Clark, *J.*).[12]

It should also be noted that the approach we adopt today will not result in unchecked abusive practices by plaintiffs. Rule 17 permits courts to deny joinder of a real party in interest where the motion is made "in bad faith or in an effort to deceive or prejudice the defendants," or where granting the motion would "otherwise result in unfairness to defendants." *Klein*, 906 F.3d at 226 (internal quotation marks omitted). Thus, if a court concludes that the original misnaming of the nominal plaintiff was done for nefarious reasons, the court retains discretion to dismiss the suit.

So, because "the concerns animating a constitutional principle are absent" where an assignee with standing seeks to join an action under Rule 17, "practical considerations may ultimately prevail." *Cortlandt*, 790 F.3d at 427 (Sack, *J.*, concurring). And it is plainly the more practical approach to permit parties to circumvent the needless formality and expense of instituting a new action simply

---

[12] Judge Clark "was a principal architect of the Federal Rules of Civil Procedure." *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 297 (1973).

47

to correct a technical error in the original pleading's caption. *See id.; Link Aviation, Inc. v. Downs*, 325 F.2d 613, 615 (D.C. Cir. 1963) ("Any other rule would be highly technical without meaningful purpose."); *cf. Scahill*, 909 F.3d at 1184 (reaching the same conclusion in the context of Rule 15(d)); *Northstar Fin. Advisors* 779 F.3d 1044–48 (same). It is perhaps for precisely this reason that several authorities have either implicitly or explicitly rejected the nullity doctrine. *See Cortlandt*, 790 F.3d at 425–27 (Sack, *J.*, concurring); *Esposito v. United States*, 368 F.3d 1271, 1276–78 (10th Cir. 2004) (permitting an estate to join a case through Rule 17 even though the case was initiated in the name of a deceased plaintiff); *see also* Wright & Miller § 3531 n.61 (characterizing the nullity doctrine as "particularly troubling").[13]

As a result, we conclude that Article III is satisfied by Fund Liquidation's standing to bring suit and willingness to join the action under Rule 17.[14]

---

[13] Though the Ninth Circuit recently agreed with the Fourth Circuit that a deceased plaintiff lacks Article III standing, the Ninth Circuit declined to decide whether Article III could nonetheless be satisfied by the existence of a separate real party in interest. *See LN Mgmt.*, 957 F.3d at 955 (declining to "rule on the tricky substitution questions that divided the Fifth Circuit . . . and the Fourth in *House*, on the one hand, from the Tenth in *Esposito*, on the other").

[14] Although it is possible that Fund Liquidation's third amended complaint exceeded the sort of "merely formal" amendment permitted by Rule 17 alone, *see Cortlandt*, 790 F.3d at 424 (internal quotation marks omitted); *Dennis*, 342 F. Supp. 3d at 416–17, the Banks have not raised that point, so we need not consider it. And even if they had, there is precedent for permitting more substantive amendments through a motion made jointly under both Rule 15 *and* Rule 17. *See Cortlandt*, 790 F.3d at 424–25 ("We cannot rule out the possibility that Cortlandt might have avoided these challenging procedural pitfalls through a request for leave to obtain a valid

## C.    The Case on Remand

Having concluded that the Dissolved Funds' lack of standing did not render this action an incurable nullity, we agree with Fund Liquidation that the case should be remanded to the district court for further proceedings.  Notably, this does not require us to resolve whether Fund Liquidation received a valid assignment from FrontPoint because the district court already concluded that Fund Liquidation received such an assignment from Sonterra.[15]  *See FrontPoint Asian Event Driven Fund*, 2018 WL 4830087, at *11.  And although Sonterra's claims were separately dismissed based on the fund not being an efficient enforcer of antitrust laws, that is a non-jurisdictional dismissal and so a valid case or controversy still exists.[16]  *See Meijer, Inc. v. Ferring B.V.* (*In re DDAVP Direct*

---

assignment under some other rule of civil procedure.  It did not.  It has relied upon only Rule 17 in the present appeal."); *see also Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 676–78 (S.D.N.Y. 2019).

[15] Indeed, the agreement between Sonterra and Fund Liquidation stated that Sonterra was assigning "any and all claims . . . related to the ownership of, or any transaction in, any [t]raded [s]ecurities," including claims that could be brought in "*any* future class action lawsuit."  J. App'x at 459 (emphasis added).  By contrast, FrontPoint assigned only those claims arising out of "any future *securities* class action or lawsuit."  J. App'x at 480 (emphasis added).  And it was this limitation to securities class actions that caused the district court to conclude that FrontPoint's assignment was ineffective.  *See Fund Liquidation Holdings*, 399 F. Supp. 3d at 102–03 (distinguishing between securities class actions and antitrust class actions involving securities).

[16] To the extent that Sonterra's status as an efficient antitrust enforcer becomes relevant at some later date in the case, the parties appear to agree that the decision in *In re LIBOR-Based Financial Instruments Antitrust Litigation*, No. 17-1569 (2d Cir.), will likely resolve the issue.

*Purchaser Antitrust Litig.*), 585 F.3d 677, 688 (2d Cir. 2009) (distinguishing Article III standing from antitrust standing).

On remand, then, the district court should reconsider two issues in light of our opinion. First, now that its jurisdiction over the case is clear, the district court should revisit whether to approve the settlement agreements signed by several of the defendants.

Second, the district court should reconsider Fund Liquidation's motion to file its proposed fourth amended complaint, which would add the Moon Funds as new representative plaintiffs. Of course, the district court alternatively held that the Moon Funds' claims were untimely as they were no longer subject to equitable tolling under *American Pipe*. *See Fund Liquidation Holdings*, 399 F. Supp. 3d at 104–05. That conclusion, however, was based on an overly expansive reading of the Supreme Court's decision in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018).

In *China Agritech*, the Supreme Court explained that "*American Pipe* tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails." *Id.* at 1804. "But *American Pipe* does not permit the maintenance of a follow-on class action past expiration of the statute of limitations." *Id.* While

the district court (and the Banks) see that language as fatal to any amendment that would add the Moon Funds as representative plaintiffs, it says nothing of the sort. The Supreme Court focused its analysis on *follow-on* class actions. *Id.* Nothing in *China Agritech* purports to say that equitable tolling does not apply to new class representatives joined within the *same* class action. Indeed, the Seventh Circuit recently reached this precise conclusion:

> [Defendant] would read *China Agritech* much more broadly to prohibit any addition or substitution of a new class representative within the original class action after the statute of limitations period would have run, but for *American Pipe* tolling. We see no hint in the *China Agritech* opinion or its reasoning that would support this proposed extension. *American Pipe* tolling is intended to promote efficiency and economy in litigation. Prohibiting its use within the original class action to add new class representatives, whether because they would be better representatives, because class definitions are modified, because subclasses are needed, or for any other case-management reason, would arbitrarily – even randomly – undermine those goals of efficiency and economy. . . . Plaintiffs here sought only to rearrange the seating chart within a single, ongoing action. What they proposed amounted to an ordinary pleading amendment governed by Federal Rule of Civil Procedure 15.

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.* (*In re Allstate Corp. Sec. Litig.*), 966 F.3d 595, 615–16 (7th Cir. 2020) (internal citations omitted).

Accordingly, so long as the amendment to add the Moon Funds as class representatives satisfies the requirements of Federal Rule of Civil Procedure 15(c)(1)(B), *see id.* at 616, and so long as the proposed fourth amended complaint otherwise plausibly states a claim on which relief can be granted, the district court should grant Fund Liquidation's motion to amend.[17]

## V. Conclusion

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** the case for further proceedings. Should any future appeal ensue related to whether Fund Liquidation may file its proposed fourth amended complaint, or whether that fourth amended complaint states a claim on which relief can be granted, any party may restore our jurisdiction pursuant to the procedure outlined in *United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994), in which event the appeal will be referred to this panel.

---

[17] The district court may also consider the argument raised by the ING entities – ING Groep N.V., ING Bank N.V., and ING Capital Markets LLC – that the Moon Funds' SOR-related claims should not relate back against them as "no complaint filed before December 2018 alleged that ING engaged in SOR panel-related conduct or was on the SOR panel." Banks Br. at 55–56.